24

CITY OF BUFFALO, Appellant-Respondent, *v.* J. W. CLEMENT COMPANY, INC. (Correct Corporate Name J. W. CLEMENT COMPANY), Respondent-Appellant, et al., Defendants.

Fourth Department, April 9, 1970.

*Anthony Manguso, Corporation Counsel (John P. Egan* of counsel), for City of Buffalo.

*Falk, Twelvetrees, Johnston & Siemer (J. Clement Johnston* of counsel), for J. W. Clement Company.

WITMER, J. Under the authority of section 555 (subd. 1, par. [a]) of the General Municipal Law the plaintiff, City of Buffalo, in January, 1967 commenced a proceeding in accordance with its charter provisions (art. 21) relating to condemnation of land for municipal purposes (L. 1929, ch. 527) to condemn the waterfront property of the defendant, J. W. Clement Company, Inc., hereinafter referred to as "Clement", in connec-

tion with an urban renewal plan known as Water Front Redevelopment Project No. U. R. N. Y., R-35. After trial in October, 1968 judgment was entered on January 24, 1969 awarding to Clement the sum of $2,030,306.96. Clement appeals from various aspects of the judgment and from two orders made therewith, and the city cross-appeals from the judgment.

The property is located at 227–265 Erie Street in Buffalo, and has 436 feet of frontage on said street and extends northerly therefrom to a navigable arm of Buffalo Harbor known as Coit Slip, upon which it has a frontage of 523 feet. It lies in a general commercial zone and is serviced by a dock and railroad as well as the street. It is improved by a large building originally built for use as a freight and passenger terminal; later used as a warehouse, and since 1946 it has been used by Clement for the conforming use of a printing plant.

Clement tried the case on the theory that the court should find that there was a *de facto* taking of the property as of April 1, 1963, from which time the city should be required to assume the cost of maintaining the property and should pay suitable interest to Clement upon the principal sums awarded. The trial court adopted this theory, and this is a primary reason for the city's appeal. Consideration of this point requires a review of the factual history of this condemnation proceeding.

FACTS

About December 10, 1954 Clement received a notice of hearing to be held at the Buffalo City Clerk's office on December 21, 1954 concerning the Buffalo Waterfront Redevelopment Project. This prompted Clement to request the Chamber of Commerce to inquire into the matter, and on December 16 at a Chamber meeting several city officials, including members of the City Planning Commission and the Commissioner of the Redevelopment Board, addressed the meeting, described the project and advised what properties, including Clement's, were planned to be taken. The record shows that from that time forward there were many meetings, official and otherwise, news releases and advices to owners in the project area as to when it was contemplated that the properties would be taken. In August, 1957 the Executive Secretary of the Planning Board advised Clement that the taking would be started between 1960 and 1962; and in December, 1957 an Urban Renewal Clinic sponsored by the Buffalo Redevelopment Foundation was held, at which time it was restated that Clement's property would be taken.

Clement's business was and is the printing of nationally read magazines, including *Time* and *Life*, and the printing of nearly one hundred million pocket-size paperback books annually. Its printing machines are of enormous size, requiring much time to set up for operation. In the light of its responsibilities to itself and its customers Clement felt a sense of urgency in ascertaining its status with respect to the redevelopment project. It made such efforts as it could to be excluded, but when that failed, it began in 1958 to look for a place to which to move.

In June, 1960 the Secretary of the City Planning Commission told Clement's president that the company would have to be out of the property within three years, and at least by 1964. In September, 1960 Clement was advised that it would be notified within 2 or 3 years to get out. In February, 1961 the Commissioner of the Redevelopment Board told Clement that all industry must be out of the area within 1½ to 2 years.

In October, 1961 Clement bought a site for a new plant in Depew, New York, having successfully applied the previous month for a permit to build there; and it began at once to build its new plant. A new press which it had bought for installation in the subject plant, was deferred and redirected for placement in the new plant. On July 18, 1962 the Mayor of Buffalo and the Commissioner of Urban Renewal advised Clement's president that in the spring of 1963 they would negotiate with him on the price to be paid for the subject property.

In October, 1962 Clement began to move its machinery to its new plant. In February, 1963 Clement received a letter from the Urban Renewal Commissioner stating that acquisition of property in the project area would begin in May, 1963 and the Commissioner confirmed this by personal conversation with an officer of Clement. Clement completed moving out of the subject property in April, 1963.

The record also contains evidence from the minutes of the City Council meetings, the Board of Redevelopment and the Board of Urban Renewal and the City Planning Board from 1954 to 1962 showing continuous agitation and actions concerning this project; and also many newspaper reports with respect thereto. In addition, the City Assessor testified that since 1959 the city had been lowering its assessments in the waterfront redevelopment area; and the City Director of Buildings testified that his department had been directed not to issue building permits in that area for new construction, and that except for one temporary permit, none was issued after 1962; but that " perhaps " permits for repairs, but not for improvements, would be issued.

There was evidence that during this period owners in the area failed to maintain their buildings, to replace broken windows or to repair the buildings after a fire; and many were vacant. Indeed, the city's principal appraisal witness acknowledged that by reason of the threat of condemnation in this area, values were drastically reduced (and see *City of Buffalo* v. *Irish Paper Co.*, 31 A D 2d 470, affd. 26 N Y 2d 869; and *City of Buffalo* v. *Strozzi*, 54 Misc 2d 1031, 1035 *et seq.*), and he testified that Clement's property by 1963 had become unsalable and unrentable. With reference to leasing, he expressed the opinion that it might have been possible to obtain a short-term tenant of the property for storage purposes, if city officials consented. In that respect, however, while Clement was moving from the property in the winter of 1963 it began making efforts to find a tenant, but those efforts were unsuccessful at all times. Thereafter Clement paid the taxes and insurance and maintained the property at its own expense, but on many occasions it advised the city of this situation and urged the city to complete the condemnation.

## De facto Taking

The trial court found that the acts of the city, including its protracted delay, "destroyed the value of the property to the defendant and made the property no longer fit to be used as the defendant had been using it and had planned to use it in the future". The trial court further found that "the city, by its threat of condemnation, forced the Clement Company to move its business operation", and that in view of the nature of its business Clement "waited to do this (move) until the last possible moment that a prudent businessman could wait". We affirm such findings. Based upon such findings the trial court held that there was a *de facto* taking of Clement's property by the city as of April 1, 1963, and that its value should be determined as of the year 1962; and he charged the city with the expense of maintaining the property from such date, and he also allowed Clement interest at the rate of 4% per annum from such date upon the award for the value of the property.

The city contends that it was contrary to law to find a *de facto* taking prior to the entry of the judgment herein (see City Charter, art. 21, §§ 382 and 388; L. 1929, ch. 527). The argument is that even if the city's acts did cause a loss of use in Clement's property, such is merely a consequence of condemnation as must be accepted without recompense by any citizen whose property is condemned.

This brings us to the crucial question of the limits of the theory and remedy of *de facto* taking in the State of New York. While the general rule in eminent domain cases is that a condemning authority does not become liable to a condemnee until title to the property is officially taken (Condemnation Law, § 4; Court of Claims Act, § 10; 17 Carmody-Wait 2d, New York Practice, § 108.19, and 19 N. Y. Jur., Eminent Domain, §§ 78 and 79), it is settled that a *de facto* taking does occur when there has been a physical invasion of a condemnee's property or a direct legal restraint on its use (*Leeds* v. *State of New York*, 20 N Y 2d 701; *Matter of Keystone Assoc.* v. *Moerdler*, 19 N Y 2d 78; *Oswego & Syracuse R. R. Co.* v. *State of New York*, 226 N. Y. 351; *Forster* v. *Scott*, 136 N. Y. 577; *Lambert* v. *State of New York*, 30 A D 2d 582 and *American Woolen Co.* v. *State of New York*, 195 App. Div. 698, 704), and the owner's claim is not dependent upon the formality of the filing of an appropriation map by the State (*Rochford* v. *State of New York*, 245 App. Div. 794, affg. 153 Misc. 239, 244; *American Woolen Co.* v. *State of New York*, *supra*, p. 701; *Rizzo* v. *State of New York*, 202 Misc. 439, 441). The question presented by this appeal is whether there can be a *de facto* taking absent a physical invasion or direct legal restraint.

There are few cases dealing with this precise question. Clearly there has been a reluctance to come to grips with it, presumably because of the potential for increased costs of public condemnations if the principle of *de facto* taking be adopted without limitation. It appears that until recent condemnations of wholesale character were undertaken, the problem was not of serious proportion. Where under new practice a serious injustice is shown to have resulted in some instance, the courts should not hesitate to act in a traditional manner to afford relief. In other fields of law the courts have so acted (see *Millington* v. *Southeastern Elevator Co.*, 22 N Y 2d 498; *Battalla* v. *State of New York*, 10 N Y 2d 237; *Ferrara* v. *Galluchio*, 5 N Y 2d 16 and *Woods* v. *Lancet*, 303 N. Y. 349). Nor did the danger of future false or exaggerated claims deter the court in *Battalla* or *Ferrara* (*supra*).

In considering the application of the theory and remedy of *de facto* taking, constitutional guarantees must guide our thinking. The New York State Constitution (art. I, § 7) provides in part " (a) Private property shall not be taken for public use without just compensation ". The Fifth Amendment to the United States Constitution contains virtually the same provision. Under such constitutional limitations the question is, what constitutes a taking?

In *Pumpelly* v. *Green Bay Co.* (80 U. S. 166, 177–178) the court said: " It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government　*　*　*　it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use."

In *United States* v. *General Motors Corp.* (323 U. S. 373, 378) the court said: "In its primary meaning, the term ' taken ' would seem to signify something more than destruction, for it might well be claimed that one does not take what he destroys. But the construction of. the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking."

In *Forster* v. *Scott* (136 N. Y. 577, 584, *supra*) the court said: " Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment, that materially affect its value, without legal process or compensation, it deprives him of his property within the meaning of the Constitution. *All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession.* It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property or the thing itself, *so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner.*"　(Emphasis added.)

In *Oswego & Syracuse R. R. Co.* v. *State of New York* (226 N. Y. 351, 359, *supra*) Judge CARDOZO said: " To destroy a bridge is to appropriate it. That there would be no remedy for the appropriation, apart from statute, is immaterial. There is an appropriation, none the less."

In *Matter of Keystone Assoc.* v. *Moerdler* (19 N Y 2d 78, 88) the court said: " The deprivation here, not being incidental to a lawful exercise of the police power, is equally unreasonable

and constitutes a taking of property for which just compensation must be paid if the statute is to be upheld [citations] ''.

In New York Jurisprudence, Eminent Domain (vol. 19, § 81) it is written: '' The constitutional provision against the taking of property without just compensation may be violated without a physical taking. * * * Injuries which in effect deprive individuals of the full or unimpaired use of their property may constitute a taking thereof.'' (And see 29A C. J. S., Eminent Domain, § 110.)

In other jurisdictions courts have recognized that announcements of impending condemnations coupled with substantial delay and damage so deprived an owner of his substantial use of property that a *de facto* taking had occurred. In *City of Detroit* v. *Cassese* (*Urban Renewal–Elmwood Park*) (376 Mich. 311) and *Foster* v. *City of Detroit* (254 F. Supp. 655, 661–666, affd. 405 F. 2d 138, 147) the doctrine of *de facto* taking was forthrightly embraced. To like effect, for damage inflicted without legal proceedings, see *Cereghino* v. *State Highway Comm.* (230 Ore. 439); *Renninger* v. *State* (70 Idaho 170); *Lage* v. *Pottawattamie County* (232 Iowa 944) and see *Widen Co.* v. *United States* (357 F. 2d 988); *Gulf States Utilities Co.* v. *Comeaux* (182 So. 2d 187 [La.]); and *Wisconsin Power & Light Co.* v. *Columbia County* (3 Wis. 2d 1). So too the trial courts of New York have found *de facto* takings in circumstances less dire than appear in the case at bar, and have allowed interest to the condemnees from the dates of such takings (*Matter of City of N. Y.* [*572 Warren St.*], 58 Misc 2d 1073, 1081; *Matter of Town of Hempstead* [*Lido Beach*], 58 Misc 2d 134, 136).

It should be noted that the quotation from *Niagara Frontier Bldg. Corp.* v. *State of New York* (33 A D 2d 130, 132) in the dissenting opinion herein relies primarily on a dictum made in *Waller* v. *State of New York* (144 N. Y. 579, 599) with respect to property lying outside of the area which the State had proposed to condemn. In view of the authorities which we have cited in support of the principle of *de facto* taking under the circumstances of this case, the dissent has softened its reliance upon the above quotation and would hold that the facts of this case do not justify the application of the principle. We hold that the facts above recited support the conclusion of the Trial Justice that Clement was deprived of the beneficial use of its property and is entitled to just compensation therefor.

Accordingly we hold that there was a *de facto* taking of Clement's property by the city in April, 1963, inasmuch as the city's acts forced Clement to move from its property at that time, rendering the property not only unsalable but unrentable

and yielding no income whatever. In so holding, we stress that there is a *de facto* taking absent physical invasion or legal restraint in the instant case only because the condemning authority has so interfered with the use of the subject property that essential elements of ownership have been destroyed and substantial justice cannot otherwise be had.

This holding is consistent with *Cicci* v. *State of New York* (31 A D 2d 733) and *Niagara Frontier Bldg. Corp.* v. *State of New York* (33 A D 2d 130, *supra*). In *Cicci* a permit under which claimant had built a second access road to his undeveloped property was revoked, and the State proceeded promptly with its *de jure* taking. In *Niagara Frontier* a tenant of the owner of the subject property asked an assistant engineer of the State Department of Public Works to confirm by letter his oral communication that the project was nearly ready and would proceed " this year "; and the tenant showed that letter to the owner who advised his tenants to move. There was no other evidence of acts by the State affecting the value of the property or requiring the owner to act or the tenants to move. Such acts did not constitute a *de facto* taking.

There is to be noted a marked distinction between (1) those cases which by reason of the cloud of condemnation, resulting in so-called condemnation blight, permit the claimant to establish his true damage for the *de jure* taking by proving its value at an earlier time before the debilitating threat of condemnation (see *State Road Dept.* v. *Chicone,* 158 So. 2d 753, 758 [Fla.]) has depressed its value (see *City of Buffalo* v. *Irish Paper Co.,* 31 A D 2d 470, *supra,* and cases cited p. 476, affd. 26 N Y 2d 869), and (2) those cases which go to the extent of declaring that the acts of the condemnor constitute a *de facto* taking long before the *de jure* taking. The application of such principles must depend not only upon the acts of the condemnor but upon the effect upon the condemnee, and the court must be guided by the further principle that its object is to achieve substantial justice between the condemning public and the private owner (see *United States* v. *Cors,* 337 U. S. 325, 332; *Searl* v. *School Dist., Lake County,* 133 U. S. 553, 562; *Matter of City of New York* [*Lincoln Sq. Slum Clearance Project*], 15 A D 2d 153, 181–182, affd. 12 N Y 2d 1086).

## Value of Land and Building

We affirm the trial court's findings of the values of the land and building. They are well within the range of evidence given by the experts for the respective parties. Clement's principal

expert estimated net rental income from the property to be $85,750 per year, from which he deducted $13,564 for land value, at 7%, leaving $72,186 for the building which he capitalized at 7% plus 4% recapture rate, producing a building value of $656,236 and land value of $193,765, which he rounded together to the sum of $850,000. Net rental leases are a recognized and often preferred method of leasing property (see *Matter of Keystone Assoc.* v. *Moerdler,* 19 N Y 2d 78, 85, *supra*). In view of the evidence of lower values presented by the city, the court was justified in finding the land value to be $175,000 and the building value to be $525,000. The additional award to Clement in the sum of $84,000 in reimbursement for its expenses for taxes, insurance and maintenance of the premises since the *de facto* taking in April, 1963 is supported by the record and should likewise be affirmed.

### VALUE OF MACHINERY

The court found that the machinery installed in the building was an integral part of a going business on the premises. As such it constituted fixtures for which compensation must be awarded in some manner (*Rose* v. *State of New York,* 24 N Y 2d 80, 86; *Matter of City of New York [Allen St.],* 256 N. Y. 236; *Matter of City of New York [Lincoln Sq. Slum Clearance],* 15 A D 2d 153, 175, affd. 12 N Y 2d 1086, *supra*). Since the machinery was movable, and the cost of moving it ($869,819.20) was far less than its value in place ($4,478,000) less the resale or salvage value ($509,250), the city need only pay the moving costs (*Rose* v. *State of New York, supra,* p. 88). Although the city offered no contrary evidence of the moving costs, the court awarded Clement therefor only the sum of $785,000. We think that this was error, and that the judgment should be modified to award to Clement the sum of $869,819.20 for its moving expenses.

The city's contention that Clement cannot recover its costs of moving the fixtures because it failed to give notice of intent to remove them (see *Great Atlantic & Pacific Tea Co.* v. *State of New York,* 22 N Y 2d 75, 90) is without merit, because the evidence shows that Clement in fact gave the city adequate notice, but, more importantly, under the circumstances of this case, no notice was required (*Rose* v. *State of New York, supra,* pp. 88–89). The city's contention that Clement cannot recover for expenses of moving the fixtures because it failed to file a notice of claim is also without merit. The fixtures were condemned along with the realty (*Matter of City of New York*

[*Allen St.*], *supra*). Just compensation to Clement requires that the city pay Clement for them or the reasonable cost of moving them, as above noted (*Rose* v. *State of New York, supra*), and the filing of a separate notice of claim was unnecessary.

However, the court awarded to Clement for installed fixtures not moved the sum of $84,000. As stated by the court in *Great Atlantic & Pacific Tea Co.* v. *State of New York* (*supra*, pp. 91–92): "It it reasonable to assume, in light of A & P's removal of all other fixtures, that these items were not removable without substantially damaging the freehold, and thus they cannot be the subject of a separate award for fixtures", citing *Marraro* v. *State of New York* (12 N Y 2d 285, 292–293). The judgment should be further modified, therefore, to eliminate the award of this item of $84,000.

## INTEREST

Clement appeals from the judgment insofar as it only awards to it interest on the award at the rate of 4%, asserting that it has had to pay much higher rates than that throughout the period from 1963 on loans in connection with its new plant. Of course, that is not the issue here. Clement further contends that the courts are not limited by statutory provisions for interest; that under the Constitution Clement is entitled to just compensation as to principal and interest, and that the Legislature may not deprive it thereof by fixing a rate of interest which is unjust and unequal. We agree that the allowance of just compensation is a judicial function (*Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 325–327; *Matter of Keystone Assoc.* v. *Moerdler,* 19 N Y 2d 78, 89, *supra*; *Matter of City of New York* [*Fifth Ave. Coach Lines*], 18 N Y 2d 212, 218). It has been held, however, that in the absence of evidence that 4% allowed to claimants on awards against municipalities in condemnation cases is unjust, the statutory provision therefor (General Municipal Law, § 3-a) is constitutional (*Matter of Port Auth., Trans-Hudson Corp.* [*Hudson Rapid Tubes Corp.*], 20 N Y 2d 457, 473, cert. den. 390 U. S. 1002). Clement has produced no evidence to establish that the 4% interest awarded by the trial court is unjust or unequal. It does point to the amendment of section 16 of the State Finance Law (L. 1966, ch. 921, eff. Aug. 1, 1966) increasing the rate which may be paid by the State on judgments or accrued claims in appropriation cases to a sum not in excess of 6% per annum. Section 3-a of the General Municipal Law was amended by chapter 1102 of the Laws of 1969 by increasing to not to exceed 6% the rate of

interest to be paid by municipalities on judgments or accrued claims in condemnation cases, effective 60 days after May 26, 1969. In *Matter of City of New York (Manhattan Civic Center-Boehm)* (57 Misc 2d 156, affd. 32 A D 2d 530) extensive evidence was presented to the court to establish that interest rates in metropolitan New York from a period beginning in 1965 and continuing to the date of trial in 1968 were in excess of 6% and were rising; and interest at the rate of 6% was allowed from the effective date of the amendment of section 16 of the State Finance Law i.e., August 1, 1966. The court based its holding on two grounds, first, the evidence introduced concerning interest rates in the area, plus the fact that the Legislature had taken cognizance as of August 1, 1966 that 6% is a fair rate, and second, that it was unconstitutional for the Legislature to permit payment of 6% to State condemnees but to restrict municipal condemnees to 4%. We take judicial notice of the record in that case and of the fact that interest rates on large sums have been substantially the same throughout the State and continued to rise through July 25, 1969, the effective date of section 3-a of the General Municipal Law, as amended (see *Matter of City of Rochester [Robfogel]*, 61 Misc 2d 231).

We reject Clement's contention that it should be allowed more than 6% for the reasons that it has presented no evidence to establish the same and that the actions of the Legislature in adopting the 6% rate in 1966 and 1969 as above stated indicate a rate of interest which is fair and just considering the rights and interests both of claimants and the public, which is the fundamental test in this respect (*Matter of City of New York [Lincoln Sq. Slum Clearance Project]*, supra, 15 A D 2d 153, 181–182, affd. 12 N Y 2d 1086).

Accordingly, interest at the rate of 4% per annum should be allowed to Clement on each of its awards from April 1, 1963 to August 1, 1966 and thereafter at the rate of 6% until entry of the judgment, and 6% should accrue upon the judgment (CPLR 5003 and 5004). With respect to the award of $84,000 for taxes and maintenance of the property since April, 1963, interest at such applicable rates should be allowed from the respective dates when Clement made the expenditures.

## COSTS, EXPENSES, FEES AND DISBURSEMENTS

Clement contends that the trial court erred in denying its application for an extra allowance of costs as provided in subdivision 2 of section 16 of the Condemnation Law. That section is constitutional (*Power Auth. of State of N. Y.* v. *Wustrack*, 11

A D 2d 974, affd. 10 N Y 2d 730; *City of Little Falls* v. *R. Greene Real Estate Corp.*, 27 A D 2d 640); and an extra allowance may be made under it to a condemnee who is awarded more than the condemnor offered for its property. If the law permits, this case *prima facie* is one in which such an allowance should be made, for it appears that while the city had an original appraisal of this property in the sum of $532,000 for the purpose of obtaining Federal funds, for trial purposes it appraised the property at $310,000, and in fact only offered to Clement the sum of $258,000 for the property; and Clement has been put to protracted litigation in this matter.

The city contends, however, that under article 21 of its charter, there is no authorization for the court to make an extra allowance to counsel. Clement urges that section 393 of the City Charter authorizes such allowance. That section provides as follows: "Procedure. When the mode or manner of conducting all or any part of the proceeding is not expressly provided for by this article, the court before which the proceeding may be pending shall have the power to make all necessary orders and give all proper directions to carry into effect the object and intent of this article, the practice in such cases to conform, as nearly as may be, to the ordinary practice in such court." We do not believe that such procedural section can properly be read to authorize an extra allowance of costs, and we have so held (*City of Buffalo* v. *Irish Paper Co.*, 31 A D 2d 470, 476–477, affd. 26 N Y 2d 869; and, see, *Matter of City of Rochester* [*Robfogel*], 61 Misc 2d 231, *supra*).

Clement further contends that article 21 of the Buffalo Charter, which establishes the law for condemnation proceedings by the plaintiff in accordance with paragraph (a) of subdivision 1 of section 555 of the General Municipal Law, is unconstitutional in that it omits provision for an extra allowance of costs to condemnees up to 5% on an award, as is authorized by section 16 of the Condemnation Law. This argument was not made in *Irish Paper Co.* (*supra*). We think that it has merit. The Buffalo Charter results in unequal and unjust treatment of those owners in Buffalo whose property is condemned by the city as distinguished from those owners whose property is otherwise condemned (see Condemnation Law, § 2 and § 4, subd. 1; Public Housing Law, §§ 120, 125; Education Law, § 2557). Hence the Buffalo Charter must be held unconstitutional insofar as it deprives Clement of equal treatment under the law, that is, with respect to an extra allowance for costs (see *Matter of City of New York* [*Manhattan Civic Center–Boehm*], 57 Misc 2d 156, 161–162, affd. upon " the reasoning of the trial court ", 32 A D

2d 530, *supra*). To be sustained the statute must be construed in substance to incorporate subdivision 2 of section 16 of the Condemnation Law (see *Matter of Keystone Assoc.* v. *Moerdler*, 19 N Y 2d 78, 88, *supra*); and we so construe it.

We also find that the trial court erred in denying Clement statutory costs and disbursements (*City of Buffalo* v. *Irish Paper Co., supra*, p. 477). We affirm the denial of Clement's application for payment of its counsel fees (see *City of Utica* v. *Gold Medal Packing Corp.*, 54 Misc 2d 721, affd. 31 A D 2d 719).

Accordingly, the second order of January 22, 1969 should be modified to reverse that part which denies an extra allowance to Clement as a matter of law, and the question of such extra allowance should be remanded to the trial court for determination in its discretion, upon proper proof, and the court should at the same time award statutory costs and disbursements to Clement. In view of such cost allowances, Clement's request for further allowance under CPLR 8303 (subd. [a], par. 2) was properly denied.

In summary, the judgment and the first order of January 22, 1969 should be modified by increasing the award for removing Clement's machinery from $785,000 to $869,819.20, by deleting from the award the sum of $84,000 allowed for machinery left in the premises, and by allowing interest on the modified award at the rate of 4% from April 1, 1963 to August 1, 1966, and thereafter at the rate of 6% in accordance with this opinion, and as so modified the judgment and order should be affirmed. The second order of January 22, 1969 should be modified by reversing the parts thereof which deny statutory costs and disbursements and an extra allowance to Clement, and such issues should be remanded to the trial court for determination, and as so modified the order should be affirmed.

GABRIELLI, J. (dissenting). I am unable to agree with the conclusion reached by the majority " that there was a *de facto* taking of [defendant's] property by the city in April, 1963 ". In fact, the record is devoid of any evidence upon which it could be found that a *de facto* taking occurred at any time. True it is, that there were various announcements made by the city regarding the prospects of redeveloping the area concerned, including a communication from the city in 1962 that negotiations for purchase of the property would be commenced in the spring of 1963. A close scrutiny of the record fails to uncover any affirmative value-depressing acts upon the part of the city which could possibly be translated into dominion or control over the property. Neither was there any interference, substan-

tial or otherwise, with claimant's right to use or enjoy the property at any time prior to the entry of the preliminary order of condemnation on February 16, 1967. The majority seizes upon the fact that there were a number of meetings with city officials regarding the impending condemnation. It is important to note that at none of these did the city, by its statements or actions, directly or indirectly, exercise any control over the property or even inferentially deprive the claimant of its possession, enjoyment or use of the property. We have not yet arrived at a point where expression of an intent to appropriate will constitute a *de facto* taking where such an announcement is unaccompanied by any act on the part of the municipality toward executing the appropriation, taking possession of or in some form controlling the use and enjoyment of the property. Indeed, it has been held that such announcements cannot be the sole basis for a *de facto* taking and '' there can be no direct recovery for a manifestation of an intent to take (*Waller* v. *State of New York,* 144 N. Y. 579, 599) or a threat to condemn (2 Nichols, Eminent Domain [3d ed.], § 6.1 [1]).'' (*Niagara Frontier Bldg. Corp.* v. *State of New York,* 33 A D 2d 130, 132).

Neither can I agree with the majority that the acts of the city, '' so interfered with the use of the subject property that essential elements of ownership have been destroyed''. There is nothing in the record that indicates any element of ownership was destroyed by an act of the city on April 1, 1963. Rather, this was the date the defendant completed its move from the premises into its new plant. It should be noted that the defendant had been anticipating this move for several years and had appointed a committee to study the problem. Commendably, the findings of that committee were introduced into evidence by the claimant. This report revealed that while the impending condemnation was a prime (but not sole) factor in inducing the move, nevertheless it would have been mandated because the existing building was becoming inadequate to handle its increased business and, in any event, would not accommodate the new printing presses ordered well prior to the move.

The location of the subject property in this case is in the same redevelopment area as the property condemned in *City of Buffalo* v. *Irish Paper Co.* (31 A D 2d 470, affd. 26 N Y 2d 869). Certain affirmative value-depressing acts were established in *Irish Paper Co.* None is found here, since no statements of the city officials, admittedly made in good faith and in furtherance of their responsibilities in this project, constituted a taking.

To apply the concept of a *de facto* taking to the case at bar would, in my opinion, result in the imposition of an oppressive

and unwarranted burden upon any condemning authority. In order to place the problem in proper perspective, we should point out the substantial difference between the concepts of a *de facto* taking and condemnation blight as they have been applied in recent holdings of our courts. It is important to bear in mind that a *de facto* taking is caused by acts which result in no less than an appropriation of property, thereby requiring the owner to be justly compensated. On the other hand, condemnation blight results from affirmative value-depressing acts on the part of the municipality requiring that evidence be received of value before such acts occurred, in order to arrive at just compensation. Thus, *de facto* taking involves the rules of *appropriation* while condemnation blight involves the rules of *evidence*.

It is undisputed that a *de facto* taking can occur when the State *enters* onto property without filing an appropriation map (*Leeds* v. *State of New York*, 20 N Y 2d 701; *Lambert* v. *State of New York*, 30 A D 2d 582). In addition, a taking which requires compensation may result from the application of a law which deprives an owner of his property or materially affects the beneficial use and the free enjoyment of it (cf. *Matter of Keystone Assoc.* v. *Moerdler*, 19 N Y 2d 78; *Forster* v. *Scott*, 136 N. Y. 577). Absent the enactment of such a law, however, we have held that a *de facto* taking does not occur without either an entry upon the land or an ouster of possession (*Cicci* v. *State of New York*, 31 A D 2d 733). Because of the mere scope of present day redevelopment projects, advance notice of areas or properties scheduled for condemnation will occur in almost every case. The application of the theories advanced by the majority to cases involving facts similar to those presented here could well throttle the right of a sovereign to prepare and make public, plans for the good of the community. To put it another way, adoption of the result reached by the majority effectively penalizes the sovereign for providing appropriate advance notice to a property owner, thus denying him adequate time to make proper plans. To encourage a converse plan of operation by a municipality would but raise havoc with an owner's rights.

We held in *City of Buffalo* v. *Irish Paper Co.* (31 A D 2d 470, affd. 26 N Y 2d 869, *supra*) that a property owner has a remedy where it would suffer severely diminished compensation because of acts by the city decreasing the value of the property, unless some relief was available. Where true condemnation blight is present a defendant may introduce evidence of value before such value was diminished by the '' affirmative

value-depressing " acts of the city. It should be noted that the problem of condemnation blight does not arise in every case despite the fact that there has been a public announcement of an impending condemnation. There must also be present, proof of affirmative acts causing a decrease in value and difficulty in arriving at a value using traditional methods.

Further distinction between that remedy and *de facto* taking was provided by *Niagara Frontier Bldg. Corp.* v. *State of New York* (33 A D 2d 130, *supra*). That case involved a claim asserted for damages resulting from an alleged " temporary *de facto* appropriation ". We there held that although tenants had vacated claimant's building in anticipation of the State's announced intention to take, there could be no recovery for lost rentals because there had been no appropriation, temporary or otherwise. Significantly, we indicated that claimant should be entitled to rely on value evidence, uninfluenced by the State's acts, on the trial of any claim resulting from the *de jure* taking.

It can, therefore, be seen from our holdings in *Niagara Frontier Bldg. Corp.*, *Irish Paper Co.* and *Cicci* that this court does not recognize a *de facto* taking without evidence of deprivation of use, title or possession, either by entry or by operation of law. There is no such evidence in this record. With the distinction between the two concepts in mind, neither is there any evidence requiring the application of the theory of condemnation blight. Unlike *Irish Paper Co.* and *Niagara Frontier Bldg. Corp.*, there were no affirmative value-depressing acts by the city.

Because of the absence of a *de facto* taking in April, 1963, we must examine the record to determine whether there is sufficient evidence upon which an award can be based for the value of the property at the time of the *de jure* taking. The defendant offered no evidence of value in 1968 based on market data, nor did the city offer any valid appraisal evidence of 1968 values whatsoever. Defendant attempted to establish a 1968 value using the reproduction cost method, but as this building was not a specialty, this approach was improper (*Guthmuller* v. *State of New York*, 23 A D 2d 597). Furthermore, the income capitalization approach used by defendant was insufficient since there was no evidence or estimate of operating expenses and fixed charges (*Svoboda* v. *State of New York*, 28 A D 2d 1056). There being no appraisal testimony or any legal evidence of value upon which an award could be based, either at the time of the entry of the preliminary order of condemnation or at the time of trial, no new findings can be made. We are unable to

fashion an award from the paucity or complete lack of acceptable value evidence.

The judgment should be reversed and a new trial ordered.

MARSH, J. P., and HENRY, J., concur with WITMER, J.; GABRIELLI, J., dissents in opinion, in which BASTOW, J., concurs.

Judgment modified on the law and facts in accordance with the opinion by WITMER, J., and as modified affirmed, with costs to J. W. Clement Company.

Order entered January 22, 1969 modified in accordance with the opinion by WITMER, J., and as modified affirmed.

Second order entered January 22, 1969 modified in accordance with the opinion by WITMER, J., and as modified affirmed, and matter of extra allowance and statutory costs remitted to trial court for determination in accordance with the opinion.